UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:09-CV-300-H

DIANA J. YATES, *et al.*

PLAINTIFFS

V.

BANKERS LIFE & CASUALTY INSURANCE CO.          DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Plaintiff brings this action seeking recovery for life insurance benefits under a policy for which her son, Dennis M. Yates ("Yates"), applied on July 22, 2008. As fate would have it, Yates passed away before the life insurance company, Bankers Life & Casualty Insurance Co. ("Bankers" or "the insurance company"), determined whether it would fully accept the application and insure Yates. Nearly two months after Yates' death, and three and half months after the initial application for coverage, Bankers denied the application and deemed Yates uninsurable. Believing that the denial was not a mere coincidence, Plaintiff claims that it was made in bad faith and, therefore, that Bankers owes the full policy amount. Bankers now moves for summary judgment on the ground that it acted in good faith in denying coverage as a matter of law. This case presents a number of interesting and challenging issues that the Court will address in turn.

**I.**

With only a few important exceptions, the facts of this case are largely undisputed.

On July 22, 2008, Yates completed an application for a term life insurance policy worth

1

$150,000.00 and paid the initial premium. On the application, he stated that his father died of cancer at the age of 57 and, it appears, answered all of the questions honestly. Yates completed the application through the local branch office of Bankers with his local sales representative, James Hazelton. That same day, Hazelton issued Yates a "conditional receipt," or binder, which stated that the coverage applied for would be effective as of the date of the application so long as certain conditions were met. One condition is relevant to this case:

> The Company, upon investigation (which investigation may extend to matters not contained in the application), is satisfied that on the applicable Effective Date of Coverage shown below, such person was insurable at a standard risk according to the Company's rules and regulations for the plan of insurance, amount of insurance and premium rule. . .

On July 30, 2008, Hazelton electronically transmitted the application to Bankers' corporate headquarters to be processed.

Upon receipt, Bankers assigned Yates' file to Sally Dattulo, a full-time underwriter. During the application review, two other Bankers' employees, Janine Foy and Sharon Neavins, also "handled" the file. Bankers requested and received medical records from Yates' primary physician, Dr. Tran.[1] Foy says that she reviewed the application and Dr. Tran's records on August 30, 2008 and noted, "ref for colonoscopy - hx of polyps - father died of colon cancer and grandfather also had it. will [sic] need the colonoscopy results."[2] However, Bankers made no request for any relevant medical records until October 3, 2008. On that date, it requested all of

---

[1] It appears that the records were received on August 14, 2008.

[2] Dr. Tran's records from May 9, 2008 state, "Will refer the pt. to Dr. Haider for colonscopy." Plaintiff contends that Yates requested such a referral as a precaution. Dr. Tran's records from November 9, 2004 state, "Patient was told that he has some polyps and he needs to be rechecked." Plaintiff contends that Yates had a colonoscopy in 2002 that showed no polyps or other major concerns. Neither party has submitted the actual results of that procedure.

2

Yates' medical records for the past five years. On October 7, 2008, Dr. Haider, to whom Yates was referred for the colonoscopy, responded that he had not seen Yates since 2002. It is undisputed that Yates never had the colonoscopy that Dr. Tran requested.

It appears that this, in essence, concluded Bankers' review of Yates' application. Bankers offers no evidence that it attempted to obtain the results of the 2002 colonoscopy[3] or that it attempted to contact Yates or anyone else to see if a colonoscopy had been done by a different physician. Furthermore, Bankers has offered no evidence that it requested a colonoscopy be done before the application could be approved or denied. Rather, Bankers claims that it simply denied the application on November 4, 2008 because it had not received all of the medical records requested and/or required. The records allegedly missing are the results of the colonoscopy ordered May 9, 2008. Of course, no such records exist.

Bankers claims that on November 4, 2008, it sent a letter of denial to the local agent[4] along with a check refunding the premium paid in advance, but it cannot produce a copy of that letter explaining the basis for denial of the policy. There is, however, an email from James Corbin, a manager at the local agency, asking that the case be reopened and the application approved on November 11, 2008. Plaintiff testified that Bankers never informed her that the policy had been denied and that, in fact, her local agents continually assured her, after November 4, 2008, that the claim was being processed and would simply take some time.

Critical to this case is the fact that Yates died as a result of a heart attack on September 11, 2008. Plaintiff states that she notified the local office within a few days of Yates' death to

---

[3] It appears that Bankers received the 2002 colonoscopy record on December 18, 2008, more than a month and a half after it claims to have denied coverage.

[4] By this time, Hazelton had left the company and Wade Sodowsky was assigned to Yates' case.

file a claim for benefits. Bankers contends that the decision makers, i.e. the underwriters, were not aware of Yates' death until the November 11, 2008 email from Corbin, which came after the underwriters denied coverage. Whether the underwriters knew or did not know of Yates' death appears to be a critical issue in this case and likely one that must be decided by a jury.

Because she had not heard anything from Bankers, Plaintiff filed a complaint with the Kentucky Department of Insurance on December 12, 2008. That department sent a letter to Bankers inquiring about the status of the claim. Bankers responded by saying that coverage was denied on November 4, 2008 because it had not received all of the medical records requested. It also attached a note from the file stating, "The application for coverage was rejected because colonoscopy results were not received prior to the death of the applicant." The department of insurance forwarded this letter to Plaintiff, which she claims was the first notification of the denial of coverage she received.

## II.

Count One of the Complaint is for breach of contract. Essentially, Plaintiff argues that the conditional receipt Bankers gave Yates created a contract of insurance and Bankers breached that contract when it refused to pay $150,000.00 in benefits upon Yates' death. The primary issue, then, is whether Bankers had a contractual obligation to provide life insurance benefits. The Kentucky Court of Appeals directly addressed this issue in *Investors Syndicate Life Ins. & Annuity Co. v. Slayton*, 429 S.W.2d 368 (Ky. Ct. App. 1968), and held,

> This is one of several standard forms of 'conditional receipts' or 'binders.' It is generally recognized by the courts of this country that this is a valid contractual provision; that it creates a contract of preliminary insurance with the reserved right in the insurer to determine in good faith the applicant's insurability; and that if the applicant is determined not to have been an insurable risk at the time of the application the company is not liable for a death that occurs during the period

4

> covered by the receipt. We concur in that view.
>
> In the instant case the company determined that Slayton was not insurable on the date of the application. Unless that decision was not made in good faith it is conclusive of the company's nonliability.

*Id.* at 370 (citations omitted); *see also Estate of Riddle v. Southern Farm Bureau Life Ins. Co.*, 421 F.3d 400 (6th Cir. 2005). Likewise, in our case, Bankers retroactively decided that Yates was uninsurable as of his application date.[5] If that decision was made in good faith, then Bankers is not liable for any benefits. On the other hand, if that decision was not made in good faith, then Bankers is liable for the full $150,000.00 policy.

### A.

The Court first considers whether the question of Bankers' good faith is one of law for the Court or one of fact for a jury. Based on *Slayton*, Bankers argues that it is a matter of law for the Court to decide. In *Slayton*, the Larue Circuit Court held a jury trial and the jury found that the defendant life insurance company did not exercise good faith in finding the plaintiff uninsurable. On appeal, the Kentucky Court of Appeals held, "In our opinion the record shows good faith beyond reasonable dispute. . . . In our opinion the [insurance company] was entitled to a directed verdict." *Slayton*, 429 S.W.2d at 370. Nothing about this language suggests that it is improper to submit the issue to a jury as a general rule. Rather, *Slayton* represents a typical determination that there was insufficient evidence for a reasonable jury to find in favor of the plaintiff; in other words, the insurance company in that case was entitled to summary judgment because there was no material factual dispute.

---

[5] "Uninsurable" is a term of art in the insurance business. It does not literally mean that the insurance company would not insure the individual under any circumstances, but only that it would not insure him at the standard premium rate.

5

Moreover, the Court finds that the Sixth Circuit considered this issue in *Riddle* and determined that the question of good faith is a proper jury question. There, the district court submitted the issue of good faith to a jury and the jury found in favor of the insured. The Sixth Circuit affirmed that verdict, stating, "So long as the plaintiffs produced sufficient evidence *to convince a reasonable jury* that the defendant rejected Riddle's application in bad faith, the fact that Southern Farm might have found Riddle uninsurable had they acted in good faith is not relevant under Kentucky law." *Riddle*, 421 F.3d at 407 (emphasis added). The Circuit went on to say that, with regard to whether the evidence established good faith, "[c]hoosing between two reasonable inferences is the function of the jury," *id.* at 408, and "the district court did not err in denying the defendant's motion for judgment as a matter of law and submitting the issue to the jury," *id.* at 409. Finally, the Circuit held that "both contract formation and [the insurance company's] alleged bad faith refusal to pay a valid claim were issues for jury determination." *Id.* at 410. This Court is bound to follow the Sixth Circuit's interpretation of Kentucky law and, therefore, finds that Bankers' good faith is a proper jury question.[6]

**B.**

The only remaining issue is whether sufficient evidence exists for a reasonable juror to find bad faith. The Court is guided in this analysis by both *Slayton* and *Riddle*.

In *Slayton*, the Kentucky Court of Appeals found that it was "beyond reasonable dispute"

---

[6] The Court notes that it has found one Kentucky case indicating that the issue of an insurance company's bad faith should be determined as a matter of law. *See Manchester Ins. & Indem. Co. v. Grundy*, 531 S.W.2d 493, 500 (Ky. Ct. App. 1976). However, the Court can find no cases since or before *Grundy* deciding the issue as a matter of law where there is sufficient evidence to decide the case in either party's favor. Moreover, recent cases appear to approve of submitting the issue to a jury. *See, e.g., Hamilton Mut. Ins. Co. of Cincinnati v. Buttery*, 220 S.W.3d 287 (Ky. Ct. App. 2007). Finally, the Sixth Circuit has made it clear that the precise issue involved here should be submitted to a jury. Thus, the Court finds that *Grundy* is distinguishable and not controlling here.

that the insurance company acted in good faith.  *Slayton*, 429 S.W.2d at 370.  There, the insured made numerous false statements on his application: (1) he indicated that he had never been denied insurance coverage by a another company when in fact he had been denied by a different life insurance company the year before; (2) he indicated that he had not been ill to the extent of requiring medical treatment within the last five years when in fact he had been hospitalized two years prior to filling out the application for a serious neurological condition and "was given numerous electric shock treatments in addition to sub-shock insulin treatments and psychotherapy," *id.* at 369; and (3) he indicated he had never been treated for a brain or nervous system condition when, in fact, he had.  Additionally, based on his neurological condition, multiple insurance company manuals classified him as "uninsurable."  Finally, there was no indication that the insurance company handled the insured's case in any unusual manner or did anything improper.  Thus, the court found that the insurance company acted in good faith.

In *Riddle*, the Sixth Circuit affirmed a jury verdict finding that the insurance company acted in bad faith in denying coverage.  There, it was undisputed that the insured suffered from numerous serious medical conditions.  The Circuit even noted that it may have been permissible to find him uninsurable in good faith.  However, the actions of the insurance company in reviewing his claim permitted an inference of bad faith.  Upon learning of his death, the insurance company removed the case from the assigned underwriter and subsequently had three supervisors review the file. Each supervisor noted additional concerns, some of which they recognized were extremely vague, and the underwriting manager admitted that he scrutinized the application more than the average one and even went through it with a "fine tooth comb."  The Circuit found this was sufficient evidence to allow a jury to find bad faith.

7

> We agree with the district court that the defendant's heightened degree of 'scrutiny might raise an inference that the Defendant sought to be as thorough and fair as possible. It might just as easily, however, raise an inference that the company was looking for reasons to deny coverage. Choosing between two reasonable inferences is the function of the jury.' Similarly, the defendant's initiation of a more intense investigation of Riddle's medical history immediately after learning of his death might be explained by equally plausible motives. The defendant received Riddle's medical records from Dr. Aaron the same day the company learned of his death. The fact that more medical records were requested the very next day might be explained by the defendant's concern over previously unknown health problems mentioned in those records. On the other hand, the investigation might also raise the inference that the defendant was attempting to procure some colorable medical reason to deny coverage.

*Riddle*, 421 F.3d at 408-09.

Certainly, our case shares more similarity with *Riddle* than *Slayton*. Here, Bankers does not even contend that Yates was, in fact, uninsurable. Rather, they simply contend that they did not have sufficient information to determine if he was insurable. While that may be true and may be a good faith denial of coverage, it may equally be reasoned that Bankers was simply looking for a reason to deny coverage, meaning that they acted in bad faith.

## C.

Numerous potentially suspicious circumstances surround Bankers' review of Yates' application. These circumstances create a reasonable possibility that Bankers acted in bad faith.

First, though Bankers noted an interest in medical records from Yates' most recent colonoscopy on August 30, 2008, it did not actually request those records until October 3, nearly a month after Yates died. Bankers offers no explanation for this delay. Then, when the response came on October 7 that Dr. Haider had not seen Yates within the last five years, Bankers appears to have simply taken no further action. It made no apparent attempt to follow up to determine whether a colonoscopy was performed by another doctor, if one was scheduled, or if Yates

8

would be willing to get one.[7]  All of those actions appear to be what a reasonable insurance company would do in response to the given situation.  Moreover, the evidence submitted thus far appears to show a total dearth of activity on Yates' application between the request for records and the denial.  Bankers offers no evidence that this was standard practice.[8]

Next, Bankers admits that Yates' file, like the file in *Riddle*, was reviewed by no less than three underwriters.  This could lead to a conclusion that Bankers was conducting an exceedingly thorough investigation to find a reason to deny coverage, just as it did in *Riddle.* Third, Bankers offered an obscure and misleading reason for denial: its failure to receive requested medical records.  While it is true that Bankers did not receive the requested medical records, i.e. a recent colonoscopy, Bankers may have known that no such records were actually available.  Thus, the more rational reason for denying coverage is insufficient medical testing to determine insurability, not a refusal to submit required medical records.  Although this is perhaps a distinction without a significant difference, by making it Bankers increases the suspicion surrounding its review of Yates' application.

Fourth, Bankers offers no evidence that it would generally deny a policy simply because an applicant failed to obtain a diagnostic test unrelated to the insurance application.  Bankers is in the business of issuing policies, not denying them.  When an application is denied, Bankers expends valuable resources determining insurability and gets nothing in return.  Thus, it is reasonable to believe that it would take all reasonable steps to determine whether Yates was or

---

[7] As will be discussed shortly, Bankers claims its underwriters did not know of Yates' death until after denying coverage.  Thus, it is not unreasonable to believe they would have requested a colonoscopy be performed before accepting or rejecting the application.

[8] In fact, the conditional receipt indicates that a coverage decision should normally be made within 60 days.  Here, Bankers took nearly three and a half months.

9

was not actually insurable, rather than simply denying coverage because of a lack of testing. That alone raises significant suspicion about the legitimacy of Bankers' denial.

Significant suspicion also surrounds the company's handling of the denial. Bankers claims to have denied the policy on November 4 by sending a letter to the local agent. Yet, it cannot produce a copy of that letter. Moreover, the local agency continued to inform Plaintiff that her son's claim was being processed and Bankers never informed her of the denial of his application. While this may be explained by a serious communication flaw between Bankers' main office and its local agencies, these facts could also raise questions as to Bankers' good faith.

Finally, Bankers claims that its underwriting agents did not know of Yates' death until after denying coverage.[9] If this is true, it would certainly go a long way in showing good faith and may even be dispositive. However, there is significant evidence from which a reasonable juror could infer to the contrary. As discussed, one could reasonably believe that an insurance company not knowing of the applicant's death would have simply requested a colonoscopy be performed before a coverage decision can be made. Bankers did not do so. It is reasonable to assume it didn't because it knew a colonoscopy was impossible due to Yates' death. Furthermore, in the letter sent to the Kentucky Department of Insurance, Bankers included a note from its file indicating "[t]he application for coverage was rejected because colonoscopy results

---

[9] Plaintiff argues that knowledge should be imputed to Bankers because she told her local agent and he told his supervisor. In many instances, informing an insurance agent of a fact related to coverage imputes that knowledge to the insurer. However, this is not such a case. The only reason that knowledge of Yates' death is relevant here is its impact on Bankers' good faith in reaching a coverage decision. Imputing knowledge would not increase or decrease the likelihood of good faith. Rather, the real issue is whether the decision makers did, in actuality, know of Yates' death prior to denying his application. If they knew, bad faith is more plausible. If they did not know, good faith is significantly more likely.

were not received prior to the death of the applicant." Depending on when this notation was made, it may indicate knowledge of Yates' death prior to a coverage determination. Finally, the significant delays in handling the case and the overall appearance of looking for a reason to deny coverage may be indicative of the underwriters' knowledge of death.

In the end, it is entirely possible that Bankers acted in good faith and simply determined that it could not insure Yates because he failed to obtain a colonoscopy. However, the suspicious actions described above make it equally possible that Bankers discovered Yates' death prior to making a coverage determination and began looking for reasons to deny coverage in bad faith. As the Sixth Circuit explained in *Riddle*, determining the correct inference from these two permissible ones is a decision properly reserved for the jury. *Riddle*, 421 F.3d at 408.

**III.**

Next, the Court considers Count Three of the Complaint, which alleges violations of the Kentucky Consumer Protection Act ("KCPA").[10] KRS § 367.170 makes it unlawful to use "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." The only false or misleading act on the part of Bankers that Plaintiff alleges is its letter to the Kentucky Department of Insurance stating that coverage was denied because requested medical records were never received. Even assuming those statements were sufficiently false or misleading to provide the basis for a KCPA claim, those statements were not aimed at Plaintiff and did not cause her any cognizable injury. The KCPA creates a cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby *suffers any ascertainable loss of money or property, real or*

---

[10] Count Two of the Complaint alleges a claim for failure to timely notify Plaintiff of the denial of coverage. Plaintiff concedes that this claim is not viable and it will, therefore, be dismissed.

11

*personal*, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170." KRS § 367.220(1) (emphasis added). Plaintiff claims that she was injured because the Kentucky Department of Insurance did not pursue her claim after receiving the false and misleading statements from Bankers. She offers no legal authority to support such a claim. The Court finds that this alleged "injury" is not an "ascertainable loss of money or property" as required by the statute. Without such an injury, Plaintiff does not have standing to pursue her claim.[11]

## IV.

Plaintiff's final claim, Count Four of the Complaint, is for violations of the Kentucky Unfair Claims Settlement Practices Act ("UCSP"), which provides a remedy for an insured whose claim is denied in bad faith. Bankers argues that the UCSP only provides a remedy for a denial of a claim, not a denial of a policy itself. The Sixth Circuit addressed this issue in *Riddle*.

> We do not agree that the sole issue in this case was whether any contract of insurance came into existence. The plaintiffs claimed not only that a valid contract existed, but also that, pursuant to the terms of that contract, they were entitled to the full value of the insurance policy once Riddle became deceased. As such, both contract formation and Southern Farm's alleged bad faith refusal to pay a valid claim were issues for jury determination.

*Riddle*, 421 F.3d at 410. Given this guidance from the Sixth Circuit, it appears that Plaintiff may proceed on her UCSP claim.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is SUSTAINED IN PART and DENIED IN PART. Counts Two and Three of the Complaint are

---

[11] Plaintiff essentially admits, with some candor, that the KCPA claim was brought because it allows recovery of punitive damages and attorney fees that may not be recoverable under a basic breach of contract claim. Of course, a desire to recover such damages does not create a plausible action under the KCPA.

DISMISSED WITH PREJUDICE.  Plaintiffs' claims for breach of contract (Count One) and bad faith denial of insurance benefits (Count Four) remain.

This is not a final and appealable order.

cc: Counsel of Record